## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Criminal No.** |
| **v.** | : | |
| | : | |
| **WALTER KENDALL MYERS,** | : | **VIOLATIONS:** |
| a/k/a Agent 202 | : | |
| | : | **18 U.S.C. § 371** |
| and | : | **(Conspiracy)** |
| | : | |
| **GWENDOLYN STEINGRABER MYERS,** | : | **18 U.S.C. § 951** |
| a/k/a Agent 123 and Agent E-634 | : | **(Agent of Foreign Government)** |
| | : | |
| **Defendants** | : | **18 U.S.C. § 1343** |
| | : | **(Wire Fraud)** |
| | : | |
| | : | **18 U.S.C. § 982** |
| | : | **(Forfeiture)** |
| | : | |
| | : | **18 U.S.C. § 2** |
| | | **(Aiding and Abetting and Causing** |
| | | **an Act to be Done)** |

## INDICTMENT

The Grand Jury charges that:

## COUNT ONE

### A.    INTRODUCTORY ALLEGATIONS

At all times material to this Indictment:

### Background of WALTER KENDALL MYERS

1.    WALTER KENDALL MYERS (KENDALL MYERS), also known as Agent 202,

is a United States citizen born in 1937, in Washington, D.C.  In or about June 1972, he earned a

PhD from Johns Hopkins University, School of Advanced International Studies (SAIS) in

Washington, D.C.

2.      From in or about 1971 to in or about 1977, KENDALL MYERS was an Assistant Professor at SAIS in the area of Western European Studies.  KENDALL MYERS continued to teach on a part-time basis as an Adjunct Professor at SAIS during the time frame of the Indictment.

3.      From in or about August 1977 through in or about March 1979, KENDALL MYERS was employed as a contract instructor at the Department of State's Foreign Service Institute (FSI), a training and professional development institute for Department of State employees located in Arlington, Virginia.

4.      After living in South Dakota with GWENDOLYN STEINGRABER MYERS from in or about 1979 until in or about 1980, KENDALL MYERS returned to Washington, D.C.

5.      Shortly after returning to Washington, D.C., KENDALL MYERS taught classes in Modern European Government at Georgetown and George Washington Universities.

6.      On or about September 1, 1981, KENDALL MYERS applied for a position with the Central Intelligence Agency.

7.      In or about August 1982, KENDALL MYERS resumed employment as a contract instructor with FSI and held the title of Chairperson for West European Studies.

8.      On or about May 9, 1983, KENDALL MYERS applied for a non-contractor, two-year appointment as a Training Instructor and Chairperson for West European Studies at FSI.

9.      On or about April 15, 1985, KENDALL MYERS was offered a two-year appointment as a Training Instructor and subsequently a second two-year appointment as an Education Specialist at FSI, all while serving in a chair capacity in Western European Area Studies.

10.     From at least in or about August 1988 to in or about October 1999, KENDALL

MYERS, in addition to his FSI duties, performed work on a periodic basis for the Department of

State's Bureau of Intelligence and Research (INR).  INR is responsible for drawing on all-source

intelligence to provide value-added independent analysis of events to policy makers at the United

States Department of State.

11.     Starting in or about October 1999, KENDALL MYERS began working full time

at INR as the Acting Director of the External Research Staff.  From in or about July 2001 until

his retirement on October 31, 2007, KENDALL MYERS was a Senior Analyst for Europe for

INR.  During his employment at INR, KENDALL MYERS specialized in intelligence analysis

regarding European matters and was responsible for a portfolio of European countries.  He also

served as a Special Assistant for Analyst Training and Development during that time frame.

12.     On October 31, 2007, KENDALL MYERS retired from the Department of State.

**Background of GWENDOLYN STEINGRABER MYERS**

13.     GWENDOLYN STEINGRABER MYERS (GWENDOLYN MYERS), also

known as Agent 123 and E-634, is a United States citizen born in 1938.   She has been married to

KENDALL MYERS since May 8, 1982.

14.     In or around 1980, GWENDOLYN MYERS moved from South Dakota to

Washington, D.C., with KENDALL MYERS.  Sometime thereafter, GWENDOLYN MYERS

was hired by Riggs National Bank as an Administrative Analyst in the Management Information

Systems (MIS).  In or around 1986, she was promoted to Special Assistant to the MIS Division

Director.

**Status of the Defendants**

15.     At no time material to this Indictment were defendants KENDALL MYERS or

GWENDOLYN MYERS:

> a.      duly accredited diplomatic or consular officers of a foreign government,
>
> recognized by the United States Department of State;
>
> b.      officially and publicly acknowledged and sponsored officials or
>
> representatives of a foreign government; or
>
> c.      officially and publicly acknowledged and sponsored members of the staff
>
> of, or employees of, any such officer, official, or representative of a foreign
>
> government.

16.     At no time did either KENDALL MYERS or GWENDOLYN MYERS provide

notification to the United States Attorney General or the Secretary of State that either of them

was acting as an agent of a foreign government as required by law.

**The Government of the Republic of Cuba**

17.     From 1959 until 2007, the Republic of Cuba was ruled by Fidel Castro.  Since

2007, the Republic of Cuba has been ruled by his brother, Raul Castro.  The government of Cuba

is an internationally-recognized foreign government and, as of the date of this Indictment, is

listed in the Diplomatic List, published by the United States Department of State, and in the

Permanent Missions to the United Nations, published by the United Nations, and its

establishments in the United States are components thereof.  Cuba is a communist country.

18.     The United States Department of State has designated Cuba as a state sponsor of

international terrorism in its State Sponsors of Terrorism List.  As of the date of this Indictment,

the United States does not maintain diplomatic relations with the government of Cuba.  The

Cuban Interests Section of the Swiss Embassy in Washington, D.C. has been designated as the

official representative of the government of Cuba to the United States.

19.     The Cuban Mission to the United Nations (CMUN) in New York City and the

Cuban Interests Section in Washington, D.C., are the principal establishments to which Cuban

government officials having diplomatic immunity – including Cuban Intelligence Service officers

– are assigned in the United States.

### Cuban Intelligence Activities in the United States

20.     The Cuban Intelligence Service (CuIS) is a general term encompassing numerous

Cuban intelligence and counterintelligence entities.  A primary such entity is the Directorate of

Intelligence (DI), formerly known as the Directorate of General Intelligence (DGI).  It is charged

with gathering worldwide intelligence information of interest to Cuba and its allies.  The United

States was, and continues to be, a principal target for Cuba's intelligence gathering.

21.     CuIS spots and assesses persons within the United States academic community

who may be suitable for recruitment to serve a variety of roles on behalf of Cuba's interests.

The most important of these roles is that of agent – that is, a person who is not an officially

recognized employee of CuIS but who is aware that he or she is working for the service and is

willing to engage in clandestine operational activity, including intelligence gathering, at the

direction, and on behalf, of CuIS.

22.     CuIS sometimes employs husband and wife "paired" agents to achieve its

intelligence goals in the United States.

23.     CuIS employs multiple code names for its agents to safeguard and protect their

identities.

24.     CuIS provides its agents with false identity and travel documents to facilitate

clandestine travel and to facilitate flight from the United States in case of detection.

25.     CuIS employs <u>handlers</u> in the United States, <u>i.e.</u>, persons who maintain some type

of personal contact with CuIS agents located in the United States.  Handlers receive reporting or

information from agents, provide tradecraft and communication tools for agents, and sometimes

direct and control agent activities based on instructions the handler has received from CuIS.

26.     A <u>brush-pass</u>, <u>pass,</u> or <u>hand-to-hand,</u> are terms used to mean a pre-arranged

momentary encounter between an agent and his or her handler, or between intelligence officers,

wherein written messages, instructions, or other items (<u>e.g.</u>, a computer thumb drive or a brief

case) are quickly and surreptitiously passed between them as they cross paths.  Such encounters

may occur in public such as on a busy street or on the subway.

27.     A <u>personal contact</u>, <u>contact</u>, or  <u>meet</u>, are terms used to mean a face-to-face

contact between an agent and his or her handler wherein operational training and details can be

discussed.

28.     A <u>parole</u> is a password or recognition phrase used between an agent and his or her

handler, or between intelligence officers, to identify each other.

**Clandestine Shortwave Radio Communications**

29.     CuIS has maintained clandestine communications with its officers, handlers, and

agents operating outside Cuba by broadcasting encrypted radio messages at certain high

frequencies (<u>i.e.</u>, shortwave frequencies).

30.     CuIS broadcasts such encrypted shortwave radio messages in Morse Code or by a

voice reading a series of numbers.

31.     KENDALL MYERS and GWENDOLYN MYERS maintain in their possession an operable shortwave radio of the same make used by CuIS agent Ana Belen Montes.   The radio was manufactured between approximately 1983 and 1986.

32.     KENDALL MYERS knows Morse Code.

## KENDALL MYERS and GWENDOLYN MYERS's Affiliation With, and Recruitment by, CuIS

33.     In December 1978, KENDALL MYERS traveled on "unofficial personal travel for academic purposes" to Cuba for approximately two weeks.  KENDALL MYERS indicated in Department of State documents that his travel was predicated on an invitation from a Cuban government official (hereinafter co-conspirator "A") after co-conspirator "A" had given a presentation at FSI.  Co-conspirator "A" served at Cuban Mission to the United Nations in New York City in the late 1970s and early 1980s.  KENDALL MYERS's guide while he was in Cuba was an official with Cuba's Foreign Service Institute (hereinafter co-conspirator "B"). KENDALL MYERS's trip to Cuba in 1978 provided CuIS with the opportunity to assess, develop and recruit KENDALL MYERS as a Cuban agent.

34.     Approximately six months after returning from Cuba, KENDALL MYERS and GWENDOLYN MYERS were visited by co-conspirator "A" in South Dakota where they were living at the time.  During that trip, KENDALL MYERS and GWENDOLYN MYERS were recruited by co-conspirator "A" and agreed to serve as clandestine agents for the Republic of Cuba.

**KENDALL MYERS's Oath of Office**

35.     On or about April 17, 1985, upon receiving a two-year appointment to the

position of Training Officer and Chairperson for West European Studies for the United States

Department of State's FSI, KENDALL MYERS signed an Oath of Office in which he swore that:

> I will support and defend the Constitution of the United States against all
> enemies foreign and domestic; that I will bear true faith and allegiance to the
> same; that I take this obligation freely, without any mental reservation or purpose
> of evasion; and that I will well and faithfully discharge the duties of the office on
> which I am about to enter.  So help me God.

**KENDALL MYERS's Access to Classified United States Government Information
At the Department of State**

36.     "Classified" information is defined by Executive Order 12958, as amended by

Executive Order 13292, and their predecessor orders, Executive Orders 12356 and 12065, as

information in any form that: (1) is owned by, produced by or for, or under control of the United

States government; (2) falls within one or more of the categories set forth in the Order; and (3) is

classified by an original classification authority who determines that its unauthorized disclosure

reasonably could be expected to result in damage to the national security.  Where such

unauthorized release could reasonably result in "serious" damage to the national security, the

information may be classified as "SECRET."  Where such damage could reasonably result in

"exceptionally grave" damage to the national security, the information may be classified as "TOP

SECRET."  Access to classified information at any level may be further restricted through

compartmentation in "SENSITIVE COMPARTMENTED INFORMATION" (SCI) categories.

37.     Classified information, of any designation, may be shared only with persons

determined by an appropriate United States government official to be eligible for access to

classified information, who have signed an approved non-disclosure agreement and who possess

a "need to know."  If a person is not eligible to receive classified information, classified

information may not be disclosed to that person.

38.     On or about October 10, 1978, while working as a contract instructor at the

Department of State's FSI, KENDALL MYERS received a SECRET security clearance for non-

employees (on a need-to-know basis), from the Department of State's Office of Security.

39.     KENDALL MYERS further received a TOP SECRET security clearance on or

about March 27, 1985, which was increased to TOP SECRET/SCI in or about September 1999,

just prior to KENDALL MYERS beginning to work full time at INR.  During his employment at

INR, KENDALL MYERS had daily access to classified information through computer databases

and otherwise.  KENDALL MYERS maintained his TOP SECRET/SCI clearance until his

retirement on October 31, 2007.

40.     On June 12, 1985, KENDALL MYERS signed a Classified Information

Nondisclosure Agreement in which he acknowledged, in part:

> Intending to be legally bound, I hereby accept the obligation contained in this
> Agreement in consideration of my being granted access to classified information. .
> . . I understand and accept that by being granted access to classified information,
> special confidence and trust shall be placed in me by the United States
> Government.
>
> I hereby acknowledge that I have received a security indoctrination concerning the
> nature and protection of classified information, including the procedures to be
> followed in ascertaining whether other persons to whom I contemplate disclosing
> this information have been approved for access to it, and that I understand those
> procedures.
>
> I have been advised and am aware that direct or indirect unauthorized disclosure,
> unauthorized retention, or negligent handling of classified information by me
> could cause irreparable injury to the United States or could be used to advantage

by a foreign nation.  I hereby agree that I will never divulge [classified] information unless I have officially verified that the recipient has been properly authorized by the United States government to receive it, or I have been given prior written notice of authorization from the United States Government Department or Agency last granting me a security clearance that such disclosure is permitted.  I further understand that I am obligated to comply with laws and regulations that prohibit the unauthorized disclosure of classified information.

I have been advised that any breach of this Agreement may result in the termination of any security clearance I hold; removal from any position of special confidence and trust requiring such a clearance; or the termination of my employment or other relationships with the Departments or Agencies that granted my security clearance or clearances. . . .

In addition, I have been advised and am aware that any unauthorized disclosure of classified information by me may constitute a violation or violations of United States criminal laws, including the provisions of . . . . Section 783(b), Title 50, United States Code . . . .

41.     Employing substantially the same language as that quoted in the paragraph above,

KENDALL MYERS acknowledged these same obligations and duties in a Classified Information

Nondisclosure Agreement which he signed on or about April 30, 1991.

42.     At no time during his employment with the Department of State was KENDALL

MYERS ever authorized, directly or indirectly, to deliver, communicate, or transmit sensitive or

classified information to agents, officers, or employees of CuIS or any other hostile foreign

intelligence service.

**B.     THE CONSPIRACY**

43.     From in or about 1979 and continuing to on or about June 4, 2009, within the

District of Columbia and elsewhere, the defendants,

**WALTER KENDALL MYERS**,
**also known as Agent 202,**

and

- 10 -

**GWENDOLYN STEINGRABER MYERS,**
**also known as Agent 123 and Agent E-634,**

unlawfully combined, conspired, confederated, and agreed together with persons known and

unknown to the Grand Jury, including agents, officers and representatives of the Republic of

Cuba, to commit offenses against the United States, to wit:

      a.      to defraud the United States and the Department of State, an agency of the United

          States, by impeding, impairing, obstructing, and defeating the Department of

          State's lawful government functions, namely depriving the Department of State

          and the United States of control over its information, and its ability to protect

          classified information against unauthorized disclosure;

      b.      to communicate, as an employee of the United States and of the Department of

          State, to a person whom such employee knows and has reason to believe was an

          agent and representative of a foreign government, namely, the Republic of Cuba,

          information the employee had reason to know had been classified, under the

          authority of the President of the United States and by the Secretary of State, as

          affecting the security of the United States, contrary to Title 50, United States

          Code, Section 783; and

      c.      to act in the United States as agents of a foreign government, namely, as agents of

          the Republic of Cuba, without prior notification to the Secretary of State prior to

          October 12, 1984 and to the Attorney General thereafter, as required by law,

          contrary to Title 18, United States Code, Section 951.

**Objects of the Conspiracy**

44.     The objects of the conspiracy were:

a.      to act as clandestine agents of the Republic of Cuba, without prior notification to

the Attorney General or the Secretary of State as required by law;

b.      to further the intelligence interests of the Republic of Cuba;

c.      to fraudulently obtain and maintain employment with the Department of State to

serve the interests of the Republic of Cuba;

d.      to deprive the United States and the Department of State, through fraud and

deceit, of control over its information, including classified information, and

provide it to agents or representatives of the Republic of Cuba; and

e.      to evade discovery and detection by the United States government.

**Manner and Means of the Conspiracy**

45.     It was part of the conspiracy that beginning in or about 1979, and continuing to on

or about June 4, 2009, KENDALL MYERS and GWENDOLYN MYERS would and did support

the Republic of Cuba in its clandestine intelligence-gathering mission against the United States

by serving as "paired" agents of CuIS.

46.     It was further part of the conspiracy that KENDALL MYERS and

GWENDOLYN MYERS would and did keep their status as CuIS agents secret in order to

protect themselves and others from prosecution and to permit KENDALL MYERS and

GWENDOLYN MYERS to engage in additional clandestine activity on behalf of CuIS.

47.     It was further part of the conspiracy that KENDALL MYERS and

GWENDOLYN MYERS would and did maintain clandestine contacts with CuIS officers and

handlers for the purpose of receiving instructions regarding their operational activities in support of CuIS and exchanging information.

48.     It was further part of the conspiracy that CuIS would and did broadcast encrypted shortwave messages to its officers, handlers, and agents.

49.     It was further part of the conspiracy that KENDALL MYERS and GWENDOLYN MYERS would and did possess and maintain an operational shortwave radio in order to receive encrypted messages from CuIS.

50.     It was further part of the conspiracy that CuIS would and did broadcast shortwave messages in Morse Code which were received by KENDALL MYERS and GWENDOLYN MYERS.

51.     It was further part of the conspiracy that, at the direction of CuIS, KENDALL MYERS would and did attempt to obtain employment in the United States government in positions that would give him access to classified information.

52.     It was further part of the conspiracy that KENDALL MYERS would and did provide false and misleading information on forms submitted to the Department of State and the United States to obtain employment, to acquire a security clearance, and to maintain his security clearance, in order to have continuing access to classified information.

53.     It was further part of the conspiracy that KENDALL MYERS would and did provide false and misleading information in response to questions asked by United States government investigators as part of background investigations to determine whether KENDALL MYERS was eligible for, and should retain, his security clearance.

54.     It was further part of the conspiracy that KENDALL MYERS would and did

obtain favorable adjudications regarding his security clearance because of the false and

misleading information provided by KENDALL MYERS to the Department of State and the

United States.

55.     It was further part of the conspiracy that KENDALL MYERS would and did

maintain continuing access to classified information relating to the national security because of

false and misleading information provided by KENDALL MYERS to the Department of State

and the United States.

56.     It was further part of the conspiracy that KENDALL MYERS would and did

obtain classified information from the Department of State and that KENDALL MYERS and

GWENDOLYN MYERS would and did provide that information to CuIS.

57.     It was further part of the conspiracy that KENDALL MYERS and

GWENDOLYN  MYERS would and did travel outside the United States, including traveling to

Cuba, to meet with their CuIS handlers.

58.     It was further part of the conspiracy that in or around 2006, KENDALL MYERS

and GWENDOLYN MYERS would and did suspend international travel to meet with their CuIS

handlers because of reasons of operational security.

59.     It was further part of the conspiracy that, because of a perceived threat to their

clandestine activities in 2006, KENDALL MYERS and GWENDOLYN MYERS would and did

destroy or dispose of certain clandestine foreign agent tradecraft items, other than their shortwave

radio, in order to protect their clandestine activities from disclosure or prosecution.

60.     It was further part of the conspiracy that even after their decision to suspend

international travel to meet face-to-face with their CuIS handlers, KENDALL MYERS and

GWENDOLYN MYERS would and did continue to maintain communications with CuIS representatives through e-mail messages employing code words and phrases sent to an e-mail account employing a false name.

61.     It was further part of the conspiracy that KENDALL MYERS and GWENDOLYN MYERS would and did periodically discuss their affinity for Cuba and clandestine activity on behalf of CuIS in order to give confidence to each other, bolster resolve, motivate each other to continue to participate in the conspiracy, allay any fear they may have, warn each other of danger and possible surveillance by United States law enforcement, and to protect themselves and each other from disclosure of past clandestine activity on behalf of CuIS and from prosecution.

62.     It was further part of the conspiracy that beginning in April 2009, KENDALL MYERS and GWENDOLYN MYERS would and did meet with, and respond to tasking from, an individual purporting to be a Cuban intelligence officer but who was, in fact, an FBI undercover source.

### Overt Acts

63.     In furtherance of the conspiracy, and to effect the objects thereof, KENDALL MYERS and GWENDOLYN MYERS, and other unindicted co-conspirators, including agents, officers, and representatives of the Republic of Cuba, did commit overt acts in the District of Columbia and elsewhere, including but not limited to, the following:

### KENDALL MYERS and GWENDOLYN MYERS's Recruitment by CuIS

a.      In or about 1979, KENDALL MYERS was recruited by CuIS representative and agreed to serve as a clandestine agent of CuIS.

b.      In or about 1979, GWENDOLYN MYERS was recruited by a CuIS representative

and agreed to serve as a clandestine agent of CuIS.

**KENDALL MYERS Seeks United States Government Employment
With Access to Sensitive and Classified United States Government Information
at the Direction of CuIS**

c.      On or about September 1, 1981, KENDALL MYERS applied for an analyst

position with the Central Intelligence Agency.  Such a position would have provided KENDALL

MYERS with access to a broad range of classified national security information.

d.      On or about April 1, 1982, KENDALL MYERS interviewed for the analyst

position with the Central Intelligence Agency.

e.      On or about May 9, 1983, KENDALL MYERS applied for two-year appointment

as a Training Instructor and Chairperson for West European Studies at the Department of State's

FSI.

f.      On or about May 9, 1983, KENDALL MYERS filled out a Form SF-86, "Security

Investigation Data for Sensitive Position" and submitted the same to the Department of State.

Completing this form was a necessary initial step towards KENDALL MYERS obtaining a TOP

SECRET security clearance.

g.      On or about April 15, 1985, KENDALL MYERS obtained a two-year

appointment as a Training Instructor and Chairperson for West European Studies at the

Department of State's FSI.

**KENDALL MYERS and GWENDOLYN MYERS's
Clandestine Communications with CuIS**

h.      At various times during the conspiracy, KENDALL MYERS and GWENDOLYN

MYERS received encrypted shortwave radio messages from CuIS in Morse Code.

      i.      From a date after 1983 to at least on or about April 15, 2009, KENDALL MYERS and GWENDOLYN MYERS maintained possession in their home of a shortwave radio which could be used to receive clandestine shortwave broadcasts from CuIS.

**CuIS Shortwave Communications to KENDALL MYERS and GWENDOLYN MYERS's Handler**

      j.      On or about November 26, 1996, CuIS sent an encrypted shortwave radio message to a handler responsible for KENDALL MYERS and GWENDOLYN MYERS (hereinafter co-conspirator "C") instructing the handler to take advantage of an upcoming pass (or brief exchange of information) with an agent to study the area of the "new residence" and to study the location of the interception of agent "123," also known as GWENDOLYN MYERS. KENDALL MYERS and GWENDOLYN MYERS moved residences on or about January 1, 1997.

      k.      On or about December 18, 1996, CuIS sent an encrypted shortwave radio message to co-conspirator "C" instructing co-conspirator "C" to show an interest in a tumor that agent "E-634," also known as GWENDOLYN MYERS, had on the shoulder.  On or about December 27, 1996, GWENDOLYN MYERS had a medical procedure to remove a tumor from her shoulder.

      l.      On or about January 15, 1997, CuIS sent an encrypted shortwave radio message to co-conspirator "C" informing co-conspirator "C" that the agents would be decoding radio messages with a new floppy disk and that CuIS had alerted the agents by radio as well.

      m.      On or about February 2, 1997, CuIS sent an encrypted shortwave radio message to co-conspirator "C" informing co-conspirator "C" that, because of a problem recovering a report

of the agents, a pass (or brief exchange of information) was being planned with the agents wherein they would repeat the information that had been lost.

n.      On or about February 26, 1997, CuIS sent an encrypted shortwave radio message to co-conspirator "C" informing co-conspirator "C" of a specific tasking sent by another intelligence officer, referred to as "GOD," to the agents concerning the collection of information of interest to CuIS.

o.      On or about March 22, 1997, CuIS  sent an encrypted shortwave radio message to co-conspirator "C" instructing co-conspirator "C"  to make a personal contact with agent "634,"also known as GWENDOLYN MYERS, to train on the use of the "Iomega" (a data storage device).

p.      On or about April 1, 1997, CuIS sent an encrypted shortwave radio message to co-conspirator "C" informing co-conspirator "C" that agent "202," also known as KENDALL MYERS, had informed CuIS that he was in the process of a clearance.

### KENDALL MYERS and GWENDOLYN MYERS's 1995 Clandestine Meeting with Fidel Castro in Cuba

q.      In or about January 1995, KENDALL MYERS and GWENDOLYN MYERS traveled to Cuba via Mexico under false names for the purpose of meeting with their CuIS handlers and representatives.

r.      In or about January 1995, while staying in a small house in Cuba, KENDALL MYERS and GWENDOLYN MYERS were visited by Fidel Castro.  Fidel Castro spent the evening with the KENDALL MYERS and GWENDOLYN MYERS and talked with them through an interpreter.

**KENDALL MYERS and GWENDOLYN MYERS's Overseas Travel for Clandestine Meetings with CuIS Handlers and Representatives**

s.      In or about January 2002, KENDALL MYERS and GWENDOLYN MYERS traveled from Washington, D.C. to Trinidad and Tobago for the purpose of clandestine meetings with CuIS handlers and representatives.

t.      In or about December 2002, KENDALL MYERS and GWENDOLYN MYERS traveled from Washington, D.C. to Jamaica for the purpose of clandestine meetings with CuIS handlers and representatives.

u.      In or about July 2003, KENDALL MYERS and GWENDOLYN MYERS traveled from Washington, D.C. to Mexico for the purpose of clandestine meetings with CuIS handlers and representatives.

v.      In or about December 2003, KENDALL MYERS and GWENDOLYN MYERS traveled from Washington, D.C. to Brazil for the purpose of clandestine meetings with CuIS handlers and representatives.

w.      In or about July 2004, KENDALL MYERS and GWENDOLYN MYERS traveled from Washington, D.C. to Ecuador for the purpose of clandestine meetings with CuIS handlers and representatives.

x.      In or about December 2004, KENDALL MYERS and GWENDOLYN MYERS traveled from Washington, D.C. to Mexico for the purpose of clandestine meetings with CuIS handlers and representatives.

y.      In or about July 2005, KENDALL MYERS and GWENDOLYN MYERS traveled from Washington, D.C. to Argentina for the purpose of clandestine meetings with CuIS handlers

and representatives.

z.      In or about December 2005, KENDALL MYERS and GWENDOLYN MYERS traveled from Washington, D.C. to Mexico for the purpose of clandestine meetings with CuIS handlers and representatives.

aa.      In or about 2006, KENDALL MYERS and GWENDOLYN MYERS elected to suspend traveling to third countries to meet with CuIS handlers and representatives because of concerns of operational security following a conflict between KENDALL MYERS and his supervisor at INR.

### KENDALL MYERS and GWENDOLYN MYERS's Continued Clandestine E-mail Communication with CuIS

bb.      On or about December 22, 2008, a CuIS representative sent an e-mail to KENDALL MYERS and GWENDOLYN MYERS that employed both a false name and code language to disguise the source and content of the e-mail.  The e-mail asked KENDALL MYERS and GWENDOLYN MYERS whether they were prepared to travel to Mexico.

cc.      On or about December 29, 2008, KENDALL MYERS and GWENDOLYN MYERS responded by e-mail to the December 22, 2008 e-mail message from a CuIS representative.  In their return e-mail, KENDALL MYERS and GWENDOLYN MYERS employed code language to disguise the content of the e-mail.  KENDALL MYERS and GWENDOLYN MYERS's return e-mail stated that they were "delighted to hear from you," but indicated that they had not yet made travel plans for the new year and would get back in touch as soon as they had done so.

dd.      On or about March 16, 2009, a CuIS representative sent another e-mail to

KENDALL MYERS and GWENDOLYN MYERS that employed both a false name and code language to disguise the source and content of the e-mail.  The sender of the e-mail again invited KENDALL MYERS and GWENDOLYN MYERS to travel to Mexico.

ee.      On or about March 27, 2009, KENDALL MYERS and GWENDOLYN MYERS responded by e-mail to the March 16, 2009, e-mail message from a CuIS representative.  In their return e-mail, KENDALL MYERS and GWENDOLYN MYERS employed code language to disguise the content of the e-mail.  In their return e-mail, KENDALL MYERS and GWENDOLYN MYERS stated a desire to "visit to see them in person" but their schedules did not allow for a trip to Mexico at the time.  KENDALL MYERS and GWENDOLYN MYERS instructed the sender of the e-mail to keep them informed of opportunities to travel to Mexico in the future.

**KENDALL MYERS's Viewing of Classified Information Related to Cuba**

ff.      From on or about August 22, 2006, until his retirement on or about October 31, 2007, while employed at INR, KENDALL MYERS viewed in excess of 200 intelligence reports which dealt with the subject of Cuba.  Out of those reports, in excess of 75 reports made no mention of areas for which KENDALL MYERS had substantive responsibility as an employee of INR.  The majority of those 75-plus reports were classified and marked SECRET and TOP SECRET.

**The Undercover Operation**

gg.      On April 15, 2009, KENDALL MYERS was approached in Washington, D.C., by an individual purporting to be a Cuban intelligence officer but who was, in fact, an FBI undercover source (UCS).  During that approach, KENDALL MYERS agreed to meet with the

UCS later that evening at a nearby hotel to discuss KENDALL MYERS providing the UCS with information and his opinions regarding the new administration in Washington, D.C., and changes happening in Cuba.

hh.     Later in the evening on April 15, 2009, KENDALL MYERS and GWENDOLYN MYERS met with the UCS in a hotel lounge, located in Washington, D.C.  During the meeting, KENDALL MYERS and GWENDOLYN MYERS accepted written tasking from the UCS, who solicited KENDALL MYERS's views and opinions of various Executive Branch personnel with backgrounds in, and responsibility for, Latin American policy.  KENDALL MYERS and GWENDOLYN MYERS agreed to meet the UCS again the following day at a different hotel in Washington, D.C.

ii.     On April 16, 2009, KENDALL MYERS and GWENDOLYN MYERS met with the UCS in a hotel room located in Washington, D.C.   During the meeting, KENDALL MYERS provided his opinions and information responding to the tasking from the UCS on the previous day.  KENDALL MYERS and GWENDOLYN MYERS also received from the UCS, and were trained in the use of, an e-mail account for future communication with the UCS.   KENDALL MYERS and GWENDOLYN MYERS agreed to use in future meetings with the UCS a parole (or recognition phrase) that KENDALL MYERS and GWENDOLYN MYERS had used in the past.   At the conclusion of the meeting, KENDALL MYERS and GWENDOLYN MYERS agreed to meet with the UCS again on April 30, 2009, at a different hotel in Washington, D.C.

jj.     On April 30, 2009, KENDALL MYERS and GWENDOLYN MYERS met with the UCS in a hotel room, located in Washington, D.C.  Upon first encountering the UCS, KENDALL MYERS exchanged with the UCS the parole agreed-upon during the April 16, 2009,

meeting.   During the meeting, KENDALL MYERS and GWENDOLYN MYERS received, and were trained in the use of, an encryption device for purposes of encrypting future e-mail communications with the UCS.   At the conclusion of the meeting, KENDALL MYERS and GWENDOLYN MYERS agreed to meet with the UCS again in or about June 2009 at a different hotel in Washington, D.C.

### False Statements and Omissions in Furtherance of the Conspiracy

kk.      On or about May 9, 1983, in response to a question on a Department of State "Statement Regarding Actions on Behalf of Foreign Principals" submitted by KENDALL MYERS as part of his application for a two-year appointment as a Training Instructor and Chairperson for West European Studies at FSI asking whether he was or ever had been an agent, representative or otherwise acted for a foreign principal, KENDALL MYERS answered "No," when, in truth and fact, as KENDALL MYERS well knew, he was an agent of CuIS.

ll.      On or about November 21, 1989, in response to a question appearing on Form SF-86, Questionnaire for Sensitive Positions, asking KENDALL MYERS to list any personal or continuing contacts he had had with a national of a communist country, KENDALL MYERS listed no such contacts, when, in truth and fact, as KENDALL MYERS well knew, he had had both personal and continuing contacts with nationals of Cuba, a communist country.

mm.      On or about January 31, 1996, during a security interview conducted in Arlington, Virginia, in response to a question posed by an agent of the United States government, KENDALL MYERS falsely stated that he did not have any regular contact with foreign nationals, when, in truth and fact, as KENDALL MYERS well knew, he had had regular contact with Cuban foreign nationals.

nn.     On or about December 29, 2000, in response to a question appearing on Form SF-86, Questionnaire for National Security Positions, asking whether KENDALL MYERS had had any contact with a foreign government, its establishments (embassies or consulates), or its representatives, other than on official United States government business, KENDALL MYERS falsely answered "No," when, in truth and fact, as KENDALL MYERS well knew, he had such contacts with representatives of Cuba.

oo.     On or about February 13, 2001, during a security interview conducted in Washington, D.C., in response to a question posed by an agent of the United States government, KENDALL MYERS falsely stated that no one in his immediate family was subject to any foreign influence, when, in truth and fact, as KENDALL MYERS well knew, his wife, GWENDOLYN MYERS, was an agent of CuIS.

pp.     On or about February 13, 2001, during a security interview conducted in Washington, D.C., in response to a question posed by an agent of the United States government, KENDALL MYERS falsely stated that he has always acted as to indicate a preference for the United States over a foreign country, when, in truth and fact, as KENDALL MYERS well knew, he had acted so as to indicate a preference for a foreign country over the United States, as he was an agent of CuIS who was providing CuIS with sensitive and classified United States government information.

qq.     On or about February 13, 2001, during a security interview conducted in Washington, D.C., in response to a question posed by an agent of the United States government, KENDALL MYERS falsely stated that there was not any other information that he knew that could suggest a conflict of interest or be a possible source of embarrassment to him, the

Department of State, or the United States, when, in truth and fact, as KENDALL MYERS well

knew, his status as an agent of CuIS created a conflict of interest with his employment with the

Department of State and would be a possible source of embarrassment to him, the Department of

State, and the United States if it were publicly disclosed.

      rr.     On or about February 13, 2001, during a security interview conducted in

Washington, D.C., in response to a question posed by an agent of the United States government,

KENDALL MYERS falsely stated that he was not engaged in activities that posed a conflict with

his security responsibilities or that would create an increased risk of unauthorized disclosure of

classified information, when, in truth and fact, as KENDALL MYERS well knew, his activities

and status as an agent of CuIS posed a conflict with his security responsibilities as an employee

of the Department of State and increased the risk of the unauthorized disclosure of classified

information.

      ss.     On or about February 13, 2001, during a security interview conducted in

Washington, D.C., in response to a question posed by an agent of the United States government,

KENDALL MYERS falsely stated that he could not think of any issue omitted from his

interview that might impact on his suitability for employment or eligibility for access to

classified information, when, in truth and fact, as KENDALL MYERS well knew, he had

concealed and omitted from his security interview the material fact that he and his wife,

GWENDOLYN MYERS, were agents of CuIS.

      tt.     On or about November 24, 2006, in response to a question on SF-86,

Questionnaire for National Security Positions, asking whether KENDALL MYERS had had any

contact with a foreign government, its establishments (embassies or consulates), or its

representatives, other than on official United States government business, KENDALL MYERS falsely answered "No," when, in truth and fact, as KENDALL MYERS well knew, he had had such contacts with representatives of Cuba.

uu.     On or about January 9, 2007, during a security interview conducted in Washington, D.C., in response to a question posed by an agent of the United States government, KENDALL MYERS falsely stated that he had no relatives, including his spouse, who are or were connected with any foreign government, to include intelligence or security services, when, in truth and fact, as KENDALL MYERS well knew, his wife, GWENDOLYN MYERS, had been and still was an agent of CuIS.

vv.     On or about January 9, 2007, during a security interview conducted in Washington, D.C., in response to a question posed by an agent of the United States government, KENDALL MYERS falsely stated that he has not had unauthorized association with a suspected or known collaborator or employee of a foreign intelligence service and he has no knowledge or suspicions of ever being a target of interest of a foreign intelligence service, when, in truth and fact, as KENDALL MYERS well knew, he had such unauthorized associations with representatives of CuIS and that he himself was an agent of CuIS.

ww.     On or about January 9, 2007, during a security interview conducted in Washington, D.C., in response to a question posed by an agent of the United States government, KENDALL MYERS falsely stated that he has not performed or attempted to perform duties, or otherwise acted, so as to serve the interests of another government in preference to the interests of the United States, when, in truth and fact, as KENDALL MYERS well knew, as an agent of CuIS, he had performed such duties and otherwise acted so as to serve the interests of the

government of Cuba in preference to the interests of the United States.

xx.     On or about January 9, 2007, during a security interview conducted in Washington, D.C., in response to a question posed by an agent of the United States government, KENDALL MYERS falsely stated that he has not deliberately omitted, concealed, or falsified relevant and material facts from any personnel security questionnaire, personal history statement or similar form used to conduct investigations, determine employment qualifications, or determine security clearance eligibility or trustworthiness, when, in truth and fact, as KENDALL MYERS well knew, he had repeatedly made material misstatements and omissions on personnel security questionnaires to prevent the Department of State from discovering the material facts that he and his wife, GWENDOLYN MYERS, were clandestine agents of CuIS.

yy.     On or about January 9, 2007, during a security interview conducted in Washington, D.C., in response to a question posed by an agent of the United States government, KENDALL MYERS falsely stated that he has not deliberately provided false or misleading information concerning relevant and material matters to an investigator or security official in connection with a personnel, security, or trustworthiness determination, when, in truth and fact, as KENDALL MYERS well knew, he had repeatedly made material misstatements to government investigators and security officials in connection with a security determination to prevent the Department of State from discovering the material facts that he and his wife, GWENDOLYN MYERS, were clandestine agents of CuIS.

zz.     On or about January 9, 2007, during a security interview conducted in Washington, D.C., in response to a question posed by an agent of the United States government, KENDALL MYERS falsely stated that he had not demonstrated a pattern of dishonesty or rule

- 27 -

violations, including violation of any written or recorded agreement made between the individual and the agency, when, in truth and fact, as KENDALL MYERS well knew, he had repeatedly demonstrated a pattern of dishonesty in his responses to his security questionnaires and in responses to questions during security interviews and he had violated his Classified Information Nondisclosure Agreements.

aaa.    On or about January 9, 2007, during a security interview conducted in Washington, D.C., in response to a question posed by an agent of the United States government, KENDALL MYERS falsely stated that he had not committed unauthorized disclosure of classified or sensitive information, when, in truth and fact, as KENDALL MYERS well knew, he had committed unauthorized disclosure of classified or sensitive information when he clandestinely provided such information to representatives of Cuba.

bbb.    On or about January 9, 2007, during a security interview conducted in Washington, D.C., in response to a question posed by an agent of the United States government, KENDALL MYERS falsely stated that he had not performed any service, whether compensated, volunteer or employment, with any foreign country, when, in truth and fact, as KENDALL MYERS well knew, he had served as a clandestine agent of CuIS.

ccc.    On or about January 9, 2007, during a security interview conducted in Washington, D.C., in response to a question posed by an agent of the United States government, KENDALL MYERS falsely stated that he could not think of any issue omitted from the interview that might impact on his suitability for employment or eligibility for access to classified information, when, in truth and fact, as KENDALL MYERS well knew, he had concealed and omitted during the interview the material facts that he and his wife,

GWENDOLYN MYERS, were clandestine agents of CuIS.

**(Conspiracy, in violation of Title 18, United States Code, Section 371)**

## COUNT TWO

64.     The allegations contained in paragraphs 1 through 42 of Count One of this

Indictment are hereby re-alleged and incorporated by reference herein.

65.     From in or about 1979 and continuing to on or about June 4, 2009, within the

District of Columbia and elsewhere, the defendants,

**WALTER KENDALL MYERS,**
**also known as Agent 202,**

and

**GWENDOLYN STEINGRABER MYERS**,
**also known as Agent 123 and E-634,**

aided and abetted by each other, without prior notification to the Secretary of State prior to

October 12, 1984 and to the Attorney General thereafter, as required by law, did knowingly act in

the United States as agents of a foreign government, specifically, the Republic of Cuba.

**(Acting as an Illegal Agent of a Foreign Government and Aiding and Abetting and Causing**
**an Act to be Done,  in violation of Title 18, United States Code, Sections 951 and 2)**

## COUNTS THREE THROUGH FIVE

### Background to the Scheme and Artifice to Defraud

66.     The allegations contained in paragraphs 1-14, 35-42, 63(c)-63(g), and 63(ff) of

Count One of this Indictment are hereby re-alleged and incorporated by reference herein as

constituting part of the scheme and artifice to defraud.

67.     On or about April 15, 1985, KENDALL MYERS obtained a two-year

appointment as a Training Instructor and Chairperson for West European Studies at the

Department of State's FSI, a position for which he received a salary of $38,852 on an annual

basis.

68.     Starting in or around October 1999, KENDALL MYERS obtained a full-time

position in the Department of State's INR, a position for which he received a salary of $82,014

on an annual basis.  By 2000, his annual salary had increased to approximately $93,308 per year.

69.     In or around July 2001, KENDALL MYERS obtained the position of Senior

Analyst for Europe in INR, for which he received an annual salary of approximately $96,325.  At

the time of his retirement in October 2007, his salary had increased to approximately $131,996

per year.

70.     All of KENDALL MYERS's positions with the Department of State from April

15, 1985, through his retirement in October 2007, were positions of special confidence and trust

that required access to classified information prepared by members of the intelligence

community, to include information classified at the TOP SECRET level.

71.     Accordingly, on or about March 27, 1985, prior to entering service on his two-

year appointment as a Training Instructor and Chairperson for West European Studies at FSI,

KENDALL MYERS was required to obtain, and did obtain, a TOP SECRET security clearance from the Department of State.  KENDALL MYERS's security clearance was increased to TOP SECRET/SCI in or about September 1999, just prior to KENDALL MYERS beginning to work full time in INR.  Thereafter, KENDALL MYERS maintained his TOP SECRET/SCI security clearance until his retirement on October 31, 2007.

**The Scheme and Artifice**

72.     From no later than in or about September 1981 and continuing to on or about October 31, 2007, in the District of Columbia and elsewhere, the defendants,

**WALTER KENDALL MYERS**,
**also known as Agent 202**,

and

**GWENDOLYN STEINGRABER MYERS,**
**also known as Agent 123 and Agent E-634,**

did devise and intend to devise a scheme and artifice to defraud the United States Department of State and to obtain monies and properties belonging to the United States Department of State and the United States government by means of materially false and fraudulent pretenses, representations, and promises.

73.     The allegations contained in paragraphs 63(kk) through 63(ccc) of Count One of this Indictment are hereby re-alleged and incorporated by reference herein as setting forth the materially false and fraudulent pretenses, representations, and promises which were further part of the scheme and artifice to defraud.  As KENDALL MYERS and GWENDOLYN MYERS plainly knew, if the truth had been known that, while KENDALL MYERS was an employee of the Department of State, both KENDALL MYERS and GWENDOLYN MYER were,

- 32 -

themselves, clandestine agents of CuIS, and had committed unauthorized disclosures of

classified or sensitive United States government information to CuIS, a hostile foreign

intelligence service, then KENDALL MYERS's eligibility for a TOP SECRET security clearance

would have been denied, his security clearance revoked, and his employment with, and salary

from, FSI and INR terminated.

74.     It was further part of the scheme and artifice that, based on the aforesaid

materially false, fraudulent and misleading pretenses, representations, and promises, KENDALL

MYERS obtained at least $1,735,054 in moneys (in the form of salary payments), funds, and

property from the United States Department of State and the United States government for the

benefit of himself and GWENDOLYN MYERS.

### Purpose of the Scheme

75.     The purpose of the scheme and artifice was for KENDALL MYERS and

GWENDOLYN MYERS to fraudulently obtain and maintain employment at the Department of

State and to fraudulently obtain moneys, funds, and property from the Department of State and

the United States government for his own use and benefit and to further the scheme by various

means, including false material pretenses, representations, and promises.

### Executions of the Scheme and Artifice

76.     On or about the dates set forth below, in the District of Columbia and elsewhere,

the defendant, KENDALL MYERS did knowingly transmit and cause to be transmitted by means

of wire communications in interstate commerce the writings, signs, and signals, set forth below:

| Count | Approximate Date | Use of Interstate Wire |
|---|---|---|
| 3 | April 14, 2005 | Transmission of a salary payment of $2,148.41, from a United States government account in Kansas City, Missouri, to a Riggs National Bank account controlled by KENDALL MYERS and GWENDOLYN MYERS, located at 1101 15th Street, N.W., Washington, D.C. 20005. |
| 4 | May 12, 2005 | Transmission of a salary payment of $2,148.41, from a United States government account in Kansas City, Missouri, to a Riggs National Bank account controlled by KENDALL MYERS and GWENDOLYN MYERS, located at 1101 15th Street, N.W., Washington, D.C. 20005. |
| 5 | December 7, 2006 | Transmission of an electronic Questionnaire for National Security Positions from a computer at the Department of State, 2210 C Street, N.W., Washington, D.C. 20520 to Bureau of Diplomatic Security, located at 1801 North Lynn Street, Arlington, Virginia 22209. |

**(Wire Fraud, in violation of Title 18, Section 1343; see also Pinkerton v. United States, 328 U.S. 640 (1946)(co-conspirator liability as to GWENDOLYN STEINGRABER MYERS))**

## CRIMINAL FORFEITURE ALLEGATION

77.     Counts Three through Five of this Indictment are re-alleged as though set forth fully herein and incorporated by reference for the purpose of alleging forfeiture to the United States of America pursuant to the provisions of Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

78.     As a result of the offenses alleged in Counts Three through Five of this Indictment, defendants WALTER KENDALL MYERS and GWENDOLYN STEINGRABER MYERS shall forfeit to the United States any and all property, real or personal, constituting, or derived from, proceeds obtained directly or indirectly, as the result of a wire fraud scheme, in violation of Title 18, United States Code, Section, 1343, including, but not limited to:

### Money Judgment

at least $1,735,054, which represents a sum of money constituting, or derived from, proceeds obtained, directly or indirectly, as a result of a wire fraud scheme, in violation of Title 18, United States Code, Section 1343.

### Personal Property

any and all funds in a roll-over IRA account, held in the name of WALTER KENDALL MYERS, account #CFE-194077, Cambridge Investment Research, maintained at Fidelity Investments up to $174,867.

which is property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of a wire fraud scheme, in violation of Title 18, United States Code, Section 1343.

79.     By virtue of the commission of the felony offenses charged in Count Three through Count Five of this Indictment, any and all interest that WALTER KENDALL MYERS and GWENDOLYN MYERS have in the property constituting, or derived from, proceeds

obtained directly or indirectly, as the result of a wire fraud scheme is vested in the United States

and hereby forfeited to the United States pursuant to Title 18, United States Code, Section

981(a)(1)(C), and Title 28, United States Code, Section 2461(c).  If,  as a result of any act or

omission of the defendants, the property identified above:

1. cannot be located upon the exercise of due diligence;
2. has been transferred or sold to, or deposited with, a third person;
3. has been placed beyond the jurisdiction of the Court;
4. has been substantially diminished in value; or
5. has been commingled with other property that cannot be subdivided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section

981(a)(1)(C), and Title 28, United States Code, Section 2461(c), and incorporating by reference

Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said

defendants up to the value of said property listed above as being subject to forfeiture.

**(Criminal Forfeiture, in violation of Title 18, United States Code, Section 981(a)(1)(C) and Title 28 United States Code, Section 2461(c))**.

A TRUE BILL:


FOREPERSON


Attorney of the United States in and for
the District of Columbia


- 36 -