UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Criminal No. 09-150 |
| v. : | |
| : | |
| WALTER KENDALL MYERS, : | VIOLATIONS: |
| a/k/a Agent 202 : | |
| : | 18 U.S.C. § 794(c) |
| Defendant : | (Conspiracy to Commit Espionage) |
| : | |
| : | 18 U.S.C. § 1343 |
| : | (Wire Fraud) |
| : | |
| : | 18 U.S.C. § 982 |
| : | (Forfeiture) |

## INFORMATION

The United States Attorney charges that:

## COUNT ONE

### A. INTRODUCTORY ALLEGATIONS

At all times material to this Information:

1. WALTER KENDALL MYERS (KENDALL MYERS), also known as Agent 202, is a United States citizen. He was an employee of the United States Department of State from in or about 1977, until his retirement on October 31, 2007. From in or about August 1977 through in or about March 1979, KENDALL MYERS was employed as a contract instructor at the Department of State's Foreign Service Institute (FSI), a training and professional development institute for Department of State employees located in Arlington, Virginia. After a break in service, KENDALL MYERS resumed employment as a contract instructor with FSI in or about August 1982 and held the title of Chairperson for West European Studies. On or about April 15,

1985, KENDALL MYERS was offered a two-year appointment as a Training Instructor and subsequently a second two-year appointment as an Education Specialist at FSI. From at least in or about August 1988 to in or about October 1999, KENDALL MYERS, in addition to his FSI duties, performed work on a periodic basis for the Department of State's Bureau of Intelligence and Research (INR). Starting in or about October 1999, KENDALL MYERS began working full time at INR as the Acting Director of the External Research Staff. From in or about July 2001 until his retirement on October 31, 2007, KENDALL MYERS was a Senior Analyst for Europe for INR. During his employment at INR, KENDALL MYERS specialized in intelligence analysis regarding European matters and was responsible for a portfolio of European countries. He also served as a Special Assistant for Analyst Training and Development during that time frame.

2. GWENDOLYN STEINGRABER MYERS (GWENDOLYN MYERS), also known as Agent 123 and E-634, is a United States citizen born in 1938. She has been married to KENDALL MYERS since May 8, 1982.

3. In or around 1980, GWENDOLYN MYERS moved from South Dakota to Washington, D.C., with KENDALL MYERS. They lived together in Washington, D.C., from that time until June 4, 2009.

4. In December 1978, KENDALL MYERS traveled on "unofficial personal travel for academic purposes" to Cuba for approximately two weeks. KENDALL MYERS indicated in Department of State documents that his travel was predicated on an invitation from a Cuban government official (hereinafter conspirator "A") after conspirator "A" had given a presentation at FSI. Conspirator "A," a representative of the Cuban Intelligence Service (CuIS), served at

Cuban Mission to the United Nations in New York City in the late 1970s and early 1980s. KENDALL MYERS' trip to Cuba in 1978 provided CuIS with the opportunity to assess and develop KENDALL MYERS as a Cuban agent.

5. Approximately six months after returning from Cuba, KENDALL MYERS and GWENDOLYN MYERS were visited by conspirator "A" in South Dakota where they were living at the time. During that trip, KENDALL MYERS and GWENDOLYN MYERS were recruited by conspirator "A" and agreed to serve as clandestine agents for the Republic of Cuba.

6. "Classified" information is defined by Executive Order 12958, as amended by Executive Order 13292, and their predecessor orders, Executive Orders 12356 and 12065, as information in any form that: (1) is owned by, produced by or for, or under control of the United States Government; (2) falls within one or more of the categories set forth in the Executive Orders; and (3) is classified by an original classification authority who determines that its unauthorized disclosure reasonably could be expected to result in damage to the national security. Where such unauthorized release could reasonably result in "serious" damage to the national security, the information may be classified as "SECRET." Where such damage could reasonably result in "exceptionally grave" damage to the national security, the information may be classified as "TOP SECRET." Access to classified information at any level may be further restricted through compartmentation in "SENSITIVE COMPARTMENTED INFORMATION" (SCI) categories.

7. Classified information, of any designation, may be shared only with persons determined by an appropriate United States Government official to be eligible for access to classified information, who have signed an approved non-disclosure agreement and who possess

a "need to know." If a person is not eligible to receive classified information, classified information may not be disclosed to that person.

8. On or about October 10, 1978, while working as a contract instructor at the Department of State's FSI, KENDALL MYERS received a SECRET security clearance from the Department of State's Office of Security.

9. KENDALL MYERS further received a TOP SECRET security clearance on or about March 27, 1985, which was increased to TOP SECRET/SCI in or about September 1999, just prior to KENDALL MYERS beginning to work full time at INR. During his employment at INR, KENDALL MYERS had daily access to classified information through computer databases and otherwise. KENDALL MYERS maintained his TOP SECRET/SCI clearance until his retirement on October 31, 2007.

10. At no time during his employment with the Department of State was KENDALL MYERS ever authorized, directly or indirectly, to deliver, communicate, or transmit sensitive or classified information to agents, officers, or employees of CuIS or any other hostile foreign intelligence service, nor were any agents, officers, or employees of CuIS entitled to receive any classified information obtained and provided by KENDALL MYERS.

11. At no time was GWENDOLYN MYERS ever granted a security clearance by the United States government, or otherwise authorized to receive classified information.

**B.   THE CONSPIRACY**

12. From in or about 1979 and continuing to on or about June 4, 2009, within the District of Columbia and elsewhere, the defendant,

**WALTER KENDALL MYERS,**

**also known as Agent 202,**

unlawfully combined, conspired, confederated, and agreed with persons known and unknown, including his wife, GWENDOLYN MYERS, and agents, officers and representatives of the Republic of Cuba, to communicate, deliver, and transmit, to a foreign government, that is, the Republic of Cuba, and to its representatives, officers, and agents thereof, documents, writings, and information relating to the national defense of the United States with the intent and reason to believe that the same would be used to the injury of the United States and to the advantage of the Republic of Cuba, in violation of Title 18, United States Code, Section 794(a).

### Manner and Means of the Conspiracy

13. It was a part of the conspiracy that, at the direction of CuIS, KENDALL MYERS would and did attempt to obtain employment in the United States government, seeking positions that would give him access to classified national defense information.

14. It was a further part of the conspiracy that KENDALL MYERS would and did utilize his position at the Department of State to gather, obtain, and retain classified national defense information of intelligence interest to the Republic of Cuba.

15. It was further part of the conspiracy that KENDALL MYERS would and did provide false and misleading information to the Department of State and the United States in order to obtain and maintain access to classified national defense information.

16. It was a further part of the conspiracy that KENDALL MYERS would and did remove classified national defense information from the Department of State for the purpose of providing it to agents, officers, and representatives of the Republic of Cuba.

17. It was a further part of the conspiracy that GWENDOLYN MYERS would and

did process classified national defense information obtained by KENDALL MYERS so that it could be passed to agents, officers, and representatives of the Republic of Cuba.

18. It was a further part of the conspiracy that KENDALL MYERS and GWENDOLYN MYERS would and did travel within the United States and elsewhere for the purpose of passing classified national defense information to agents, officers, and representatives of the Republic of Cuba.

19. It was a further part of the conspiracy that KENDALL MYERS and GWENDOLYN MYERS would and did utilize various methods of tradecraft, such as "dead drops," "brush passes," and switching carts in supermarkets, to clandestinely pass classified national defense information to agents, officers, and representatives of the Republic of Cuba.

20. It was further part of the conspiracy that KENDALL MYERS and GWENDOLYN MYERS would and did travel outside the United States, including traveling to Cuba, to meet with their CuIS handlers.

21. It was further part of the conspiracy that KENDALL MYERS and GWENDOLYN MYERS would and did continue to maintain communications with CuIS representatives through e-mail messages employing code words and phrases sent to an e-mail account employing a false name.

22. It was further part of the conspiracy that beginning in April 2009, and continuing until on or about June 4, 2009, KENDALL MYERS and GWENDOLYN MYERS would and did meet with, and respond to tasking from, an individual purporting to be a Cuban intelligence officer but who was, in fact, an FBI undercover source.

**Overt Acts**

23.     In furtherance of the conspiracy, and to effect the objects thereof, KENDALL MYERS and other co-conspirators, including his wife, GWENDOLYN MYERS, and agents, officers, and representatives of the Republic of Cuba, did commit overt acts in the District of Columbia and elsewhere, including but not limited to, the following:

    a.     In or about 1979, KENDALL MYERS and GWENDOLYN MYERS agreed to serve as clandestine agents of CuIS after being recruited by conspirator "A."

    b.     On or about September 1, 1981, at the direction of CuIS, KENDALL MYERS applied for an analyst position with the Central Intelligence Agency. Such a position would have provided KENDALL MYERS with access to a broad range of classified national security information.

    c.     On or about May 9, 1983, at the direction of CuIS, KENDALL MYERS applied for a two-year appointment as a Training Instructor and Chairperson for West European Studies at the Department of State's FSI.

    d.     On or about May 9, 1983, KENDALL MYERS filled out a Form SF-86, "Security Investigation Data for Sensitive Position" and submitted the same to the Department of State. Completing this form was a necessary initial step towards KENDALL MYERS obtaining a TOP SECRET security clearance.

    e.     From a date after 1983 to at least on or about June 4, 2009, KENDALL MYERS and GWENDOLYN MYERS maintained possession in their home of a shortwave radio which could be used to receive clandestine shortwave broadcasts from CuIS.

    f.     In or about January 1995, KENDALL MYERS and GWENDOLYN MYERS traveled to Cuba via Mexico under false names for the purpose of meeting with their CuIS

handlers and representatives.

g.  In or about January 1995, while staying in a small house in Cuba, KENDALL MYERS and GWENDOLYN MYERS were visited by Fidel Castro. Fidel Castro spent the evening with them and spoke with them through an interpreter.

h.  From in or about January 2002, until in or about December 2005, KENDALL MYERS and GWENDOLYN MYERS traveled from Washington, D.C. to various locations outside the United States for the purpose of clandestine meetings with CuIS handlers and representatives.

i.  From in or about December 2008, until in or about March 2009, KENDALL MYERS and GWENDOLYN MYERS exchanged e-mail messages with a CuIS representative in which they both used coded language to discuss potential operational travel.

j.  From in or about May 1983, until in or about January 2007, KENDALL MYERS provided materially false and misleading information on forms submitted to the Department of State and in response to questions asked by United States government investigators, for the purpose of obtaining employment and acquiring and maintaining a security clearance so as to have access to classified information.

k.  From on or about August 22, 2006, until his retirement on or about October 31, 2007, while employed at INR, KENDALL MYERS utilized his Department of State computer to view in excess of 200 intelligence reports which dealt with the subject of Cuba.

l.  From in or about August 2006 until in or about October 2006, KENDALL MYERS gathered and retained, for the benefit of CuIS, United States government information concerning sources and methods of gathering intelligence, which information related to the

national defense and was classified TOP SECRET.

  m. On or about April 15, 2009, KENDALL MYERS accepted written tasking from an undercover source of the FBI (UCS) who purported to be a CuIS intelligence officer.

  n. On or about April 16, 2009, GWENDOLYN MYERS agreed to use a parole (or pass phrase) for future meetings with the UCS.

  o. On or about April 16, 2009, KENDALL MYERS and GWENDOLYN MYERS received from the UCS, and were trained in the use of, an e-mail account for future communication with the UCS.

  p. On or about April 30, 2009, KENDALL MYERS and GWENDOLYN MYERS received from the UCS, and were trained in the use of, an encryption device for purposes of encrypting future e-mail communications with the UCS.

  q. On or about June 4, 2009, KENDALL MYERS disclosed to the UCS United States government information concerning sources and methods of gathering intelligence, which information related to the national defense and was classified TOP SECRET. KENDALL MYERS admitted to the UCS that he knew the information was classified TOP SECRET and that he had previously disclosed it to CuIS.

**(Conspiracy, in violation of Title 18, United States Code, Section 794(c))**

## COUNTS TWO AND THREE

### A.  BACKGROUND TO THE SCHEME AND ARTIFICE TO DEFRAUD

24.  The allegations contained in paragraphs 1-23 of Count One of this Information are hereby re-alleged and incorporated by reference herein as constituting part of the scheme and artifice to defraud.

25.  On or about April 15, 1985, KENDALL MYERS obtained a two-year appointment as a Training Instructor and Chairperson for West European Studies at the Department of State's FSI, a position for which he received a salary of $38,852 on an annual basis.

26.  Starting in or around October 1999, KENDALL MYERS obtained a full-time position in the Department of State's INR, a position for which he received a salary of $82,014 on an annual basis. By 2000, his annual salary had increased to approximately $93,308 per year.

27.  In or around July 2001, KENDALL MYERS obtained the position of Senior Analyst for Europe in INR, for which he received an annual salary of approximately $96,325. At the time of his retirement in October 2007, his salary had increased to approximately $131,996 per year.

28.  All of KENDALL MYERS' positions with the Department of State from April 15, 1985, through his retirement in October 2007, were positions of special confidence and trust that required access to classified information prepared by members of the Intelligence Community, to include information classified at the TOP SECRET level.

29.  Accordingly, on or about March 27, 1985, prior to entering service on his two-year appointment as a Training Instructor and Chairperson for West European Studies at FSI,

KENDALL MYERS was required to obtain, and did obtain, a TOP SECRET security clearance from the Department of State. KENDALL MYERS' security clearance was increased to TOP SECRET/SCI in or about September 1999, just prior to KENDALL MYERS beginning to work full time in INR. Thereafter, KENDALL MYERS maintained his TOP SECRET/SCI security clearance until his retirement on October 31, 2007.

### B.   THE SCHEME AND ARTIFICE TO DEFRAUD

30.   From no later than in or about September 1981 and continuing to on or about October 31, 2007, in the District of Columbia and elsewhere, the defendant,

**WALTER KENDALL MYERS,**
**also known as Agent 202,**

did devise and intend to devise a scheme and artifice to defraud the United States Department of State and to obtain monies and properties belonging to the United States Department of State and the United States government by means of materially false and fraudulent pretenses, representations, and promises.

31.   It was part of the scheme and artifice to defraud that beginning at least on or about May 9, 1983, and continuing at least until on or about November 24, 2006, that KENDALL MYERS would provide materially false information in documents submitted to the Department of State in order to obtain and retain employment with the Department of State and to obtain and retain his security clearance.

32.   It was part of the scheme and artifice to defraud that beginning at least on or about January 31, 1996, and continuing until at least on or about January 9, 2007, KENDALL MYERS would make materially false statements to United States government investigators during

background interviews in order to maintain and retain employment with the Department of State and to obtain and retain his security clearance.

33. It was part of the scheme and artifice to defraud that on or about May 9, 1983, in response to a question on a Department of State "Statement Regarding Actions on Behalf of Foreign Principals" submitted by KENDALL MYERS as part of his application for a two-year appointment as a Training Instructor and Chairperson for West European Studies at FSI asking whether he was or ever had been an agent, representative or otherwise acted for a foreign principal, KENDALL MYERS answered "No," when, in truth and fact, as KENDALL MYERS well knew, he was an agent of CuIS.

34. It was further a part of the scheme and artifice to defraud that on or about November 21, 1989, in response to a question appearing on Form SF-86, Questionnaire for Sensitive Positions, asking KENDALL MYERS to list any personal or continuing contacts he has had with a national of a communist country, KENDALL MYERS listed no such contacts, when, in truth and fact, as KENDALL MYERS well knew, he had had both personal and continuing contacts with nationals of Cuba, a communist country.

35. It was further a part of the scheme and artifice to defraud that on or about January 31, 1996, during a security interview conducted in Arlington, Virginia, in response to a question posed by an agent of the United States government, KENDALL MYERS falsely stated that he did not have any regular contact with foreign nationals, when, in truth and fact, as KENDALL MYERS well knew, he had had regular contact with Cuban foreign nationals.

36. It was further a part of the scheme and artifice to defraud that on or about December 29, 2000, in response to a question appearing on Form SF-86, Questionnaire for

National Security Positions, asking whether KENDALL MYERS had had any contact with a foreign government, its establishments (embassies or consulates), or its representatives, other than on official United States government business, KENDALL MYERS falsely answered "No," when, in truth and fact, as KENDALL MYERS well knew, he had such contacts with representatives of Cuba.

37.   It was further a part of the scheme and artifice to defraud that on or about February 13, 2001, during a security interview conducted in Washington, D.C., in response to a question posed by an agent of the United States government, KENDALL MYERS falsely stated that no one in his immediate family was subject to any foreign influence, when, in truth and fact, as KENDALL MYERS well knew, his wife, GWENDOLYN MYERS, was an agent of CuIS.

38.   It was further a part of the scheme and artifice to defraud that on or about February 13, 2001, during a security interview conducted in Washington, D.C., in response to a question posed by an agent of the United States government, KENDALL MYERS falsely stated that he has always acted as to indicate a preference for the United States over a foreign country, when, in truth and fact, as KENDALL MYERS well knew, he had acted so as to indicate a preference for a foreign country over the United States, as he was an agent of CuIS who was providing CuIS with sensitive and classified United States government information.

39.   It was further a part of the scheme and artifice to defraud that on or about November 24, 2006, in response to a question on SF-86, Questionnaire for National Security Positions, asking whether KENDALL MYERS had had any contact with a foreign government, its establishments (embassies or consulates), or its representatives, other than on official United States government business, KENDALL MYERS falsely answered "No," when, in truth and fact,

as KENDALL MYERS well knew, he had had such contacts with representatives of Cuba.

40. It was further a part of the scheme and artifice to defraud that on or about January 9, 2007, during a security interview conducted in Washington, D.C., in response to a question posed by an agent of the United States government, KENDALL MYERS falsely stated that he had not committed unauthorized disclosure of classified or sensitive information, when, in truth and fact, as KENDALL MYERS well knew, he had committed unauthorized disclosure of classified or sensitive information when he clandestinely provided such information to representatives of Cuba.

41. As KENDALL MYERS plainly knew, if the truth had been known that, while KENDALL MYERS was an employee of the Department of State, both KENDALL MYERS and GWENDOLYN MYERS were, themselves, clandestine agents of CuIS and had committed unauthorized disclosures of classified or sensitive United States government information to CuIS, a hostile foreign intelligence service, then KENDALL MYERS' eligibility for a TOP SECRET security clearance would have been denied, his existing security clearance would have been revoked, and his employment with, and salary from, FSI and INR would have been terminated.

42. It was further part of the scheme and artifice that, based on upon materially false, fraudulent and misleading pretenses, representations, and promises, KENDALL MYERS obtained at least $1,735,054 in moneys (in the form of salary payments), funds, and property from the United States Department of State and the United States Government for the benefit of himself and GWENDOLYN MYERS.

C. **EXECUTIONS OF THE SCHEME AND ARTIFICE TO DEFRAUD**

43. On or about the dates set forth below, in the District of Columbia and elsewhere,

the defendant, KENDALL MYERS did knowingly transmit and cause to be transmitted by means of wire communications in interstate commerce the writings, signs, and signals, set forth below:

| Count | Approximate Date | Use of Interstate Wire |
|---|---|---|
| 2 | April 14, 2005 | Transmission of a salary payment of $2,148.41, from a United States government account in Kansas City, Missouri, to a Riggs National Bank account controlled by KENDALL MYERS and GWENDOLYN MYERS, located at 1101 15th Street, N.W., Washington, D.C. 20005. |
| 3 | December 7, 2006 | Transmission of an electronic Questionnaire for National Security Positions from a computer at the Department of State, 2210 C Street, N.W., Washington, D.C. 20520 to Bureau of Diplomatic Security, located at 1801 North Lynn Street, Arlington, Virginia 22209. |

**(Wire Fraud, in violation of Title 18, Section 1343)**

## CRIMINAL FORFEITURE ALLEGATION

44.     Counts Two and Three of this Information are re-alleged as though set forth fully herein and incorporated by reference for the purpose of alleging forfeiture to the United States of America pursuant to the provisions of Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

45.     As a result of the offenses alleged in Counts Two and Three of this Information, defendant WALTER KENDALL MYERS shall forfeit to the United States any and all property, real or personal, constituting, or derived from, proceeds obtained directly or indirectly, as the result of a wire fraud scheme, in violation of Title 18, United States Code, Section, 1343, including, but not limited to:

### Money Judgment

> at least $1,735,054, which represents a sum of money constituting, or derived from, proceeds obtained, directly or indirectly, as a result of a wire fraud scheme, in violation of Title 18, United States Code, Section 1343.

which is property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of a wire fraud scheme, in violation of Title 18, United States Code, Section 1343.

46.     By virtue of the commission of the felony offenses charged in Counts Two and Three of this Information, any and all interest that WALTER KENDALL MYERS has in the property constituting, or derived from, proceeds obtained directly or indirectly, as the result of a wire fraud scheme is vested in the United States and hereby forfeited to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code,

Section 2461(c). If, as a result of any act or omission of the defendants, the property identified above:

1. cannot be located upon the exercise of due diligence;
2. has been transferred or sold to, or deposited with, a third person;
3. has been placed beyond the jurisdiction of the Court;
4. has been substantially diminished in value; or
5. has been commingled with other property that cannot be subdivided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), and incorporating by reference Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendant up to the value of said property listed above as being subject to forfeiture.

**(Criminal Forfeiture, in violation of Title 18, United States Code, Section 981(a)(1)(C) and Title 28 United States Code, Section 2461(c)).**

CHANNING D. PHILLIPS
Acting United States Attorney
for the District of Columbia

*/s/ G. Michael Harvey*

G. MICHAEL HARVEY
Assistant United States Attorney
D.C. Bar #447465
National Security Section
United States Attorney's Office
555 Fourth Street, N.W., 11th Floor
Washington, D.C. 20530
(202) 305-4155
Michael.Harvey2@usdoj.gov

Dated: November 17, 2009